1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable Grady J Leupold

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

PERIDOT TREE WA, INC.,

                    Plaintiff,

         v.

WASHINGTON STATE LIQUOR AND
CANNABIS CONTROL BOARD and
WILLIAM LUKELA, in his legal
capacity as Director of Washington State
Liquor and Cannabis Board,

                    Defendants.

NO.  3:23-cv-06111

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

**Noting Date: December 15, 2023**

## I.      INTRODUCTION

Peridot Tree WA (Peridot) seeks—on an emergency basis—to rewrite Washington's marijuana laws to allow out-of-state citizens to apply for and receive Washington marijuana licenses by petitioning for a declaratory judgment based on a federal constitutional challenge to Washington's Residency Requirements and the Social Equity Scoring criteria. This Court rejected an almost identical challenge to Washington's Residency Requirements earlier this year and should do so again here. *See, Brinkmeyer v. Washington State Liquor and Cannabis Board*,

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

1

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1    No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023); Declaration of Jonathan E.

2    Pitel ¶ 2, Ex. 1. Peridot's request for a temporary restraining order fails for at least four reasons.

3            To start, there is no emergency justifying a temporary restraining order. By Peridot's own

4    admission, it has sat on its hands for months, if not years, before seeking emergency relief from

5    this Court. The law establishing the residency requirement Peridot challenges was passed in

6    2012. The Society Equity Program Peridot challenges was announced in 2020 and its criteria

7    have been known since October 2022. And Peridot's own license application was rejected in

8    September 2023. Peridot provides no explanation for waiting all this time, only to now seek

9    emergency relief on a two-day briefing schedule. Its own lack of diligence belies any claimed

10   urgency here and forecloses the emergency relief it seeks.

11           Second, Peridot cannot demonstrate a likelihood of success on the merits for multiple

12   reasons. As a threshold matter, Peridot lacks standing in this case because it did not and cannot

13   demonstrate that it would have received one of the eight licenses located in King County among

14   the 124 scored Social Equity applicants if Washington's Residency Requirements were not in

15   place. As such, they cannot receive any relief from this Court. Further, this Court has already

16   determined that the dormant Commerce Clause does not apply to the same residency

17   requirements of Washington challenged in this lawsuit. *See Brinkmeyer* 2023 WL 1798173

18   (W.D. Wash. Feb. 7, 2023). Peridot cannot not meet its heavy burden to establish likely success

19   on the merits.

20           Third, the balance of equities tips sharply against Peridot. Other businesses have already

21   expended significant sums to prepare to operate their businesses in Washington and will suffer

22   real and substantial harm if this Court enjoins the program, tipping the equities in favor of denial.

23   Fourth, and finally, there is no public interest served by granting Peridot's motion. This Court

24   should deny Peridot's request for a TRO and its motion for a preliminary injunction.

25

26

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

2

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

## II.      FACTUAL BACKGROUND

### A.      Washington Marijuana Law

In 2012, Washington voters approved Initiative Measure No. 502 (I-502). *See* Smith Decl. ¶ 1. I-502 established a regulatory system for the sale, production, and processing of limited amounts of marijuana for recreational use by adults. I-502, 2013 Wash. Sess. Laws 28-67. Washingtonians empowered the Liquor and Cannabis Board ("Board") to enforce I-502 and to implement rules to meet the goal of "tak[ing] marijuana out of the hands of illegal drug organizations" and create "a tightly regulated, state-licensed system similar to that for controlling hard alcohol." 2013 Wash. Sess. Laws 29; Wash. Rev. Code §§ 69.50.331(4), .342, .345 (2013). The initiative also limited participation in the newly decriminalized market to Washington residents.

The licensed sale of regulated marijuana does not violate Washington law: however, it remains a criminal offense under federal law. Pursuant to the Controlled Substance Act (CSA), Congress deemed marijuana a Schedule I drug and made any *interstate* marijuana trade illegal. 21 U.S.C. § 812(c) (2018); 21 U.S.C. § 841(a) (2018). Despite the CSA, some states have authorized the *intrastate* production, sale, and possession of marijuana in certain circumstances, and have regulated their intrastate market to protect the health, safety and welfare of their state's citizens.

In 2015, Washington merged its recreational and medical marijuana markets and expanded the number of retail licenses available. 2015 Wash. Sess. Laws 287, 299-300. The Legislature mandated that priority for these new licenses be given to those who operated a Washington collective garden and paid Washington taxes. Former Wash. Rev. Code § 69.50.331(1)(a) (2015).

### B.      Washington's Social Equity Program

Washington's Legislature adopted a Social Equity Program in 2020 to help remedy "harms resulting from the enforcement of cannabis-related laws in disproportionally impacted

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION -- NO. 3:23-CV-06111

3

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

areas …" and to "further an equitable cannabis industry by promoting business ownership among individuals who have resided in areas of high poverty and high enforcement of cannabis-related laws." Washington Laws of 2020, chpt. 236, § 1(3).

The Social Equity Program required the Board to hold all retail marijuana licenses "that had been subject to forfeiture, revocation or cancellation by the board," and any marijuana license that could have been issued but had not been issued from December 1, 2020 to July 1, 2023. Former Wash. Rev. Code § 69.50.335(1) (2022).[1] Under the law, these reserved licenses could only be awarded to Social equity applicants. Wash. Rev. Code § 69.50.335(2)(a).

To qualify for the program, an applicant must meet two of the following three criteria:

- Lived in a disproportionately impacted area in Washington for a minimum of five years between 1980 and 2010;
- Been arrested or convicted of a cannabis offense, or had a family member arrested or convicted of a cannabis offense;
- Had a household income in the year prior to submitting an application of less than the median household income in Washington.

Wash. Admin. Code § 314-55-570; Wash. Rev. Code § 69.50.335(2022).

The Social Equity application window opened on March 1, 2023 and closed April 27, 2023. Social Equity Applicants first had to electronically file an application with the Department of Revenue's Business Licensing Online Application System. Wash. Admin. Code § 314-55-570(3)(a). Approximately 500 Social Equity applications were filed. Reid Decl. ¶ 5.

The Legislature required the Board to use a third party contractor to evaluate and score Social Equity applications. *See* Wash. Admin. Code § 314-55-570. The Board selected Ponder Diversity Group (Ponder) for this purpose. Reid Decl. ¶ 6.

The Board sent applications to Ponder in May 2023 for evaluation and scoring. Ponder required each applicant to complete an online application and questionnaire. Reid Decl. ¶ 8-10. Ponder also required applicants to provide documents that supported and validated their

---

[1] In 2023, Washington's Legislature adopted ESSB 5080 which changed the definition of a disproportionally impacted area and of a Social Equity applicant. See ESSB 5080 § 3 which was codified in Wash. Rev. Code 69.50.335(6) (2023).

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

4

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1   responses. *See* Wash. Admin. Code § 314-55-570(3)(c)(ii). After completion of the

2   questionnaire and submission of documentation, Ponder conducted a Preliminary Qualification

3   Review to ensure that an applicant met the criteria for licensure as well as the Social Equity

4   Program. *See*, Wash. Admin. Code § § 314-55-015(2), 314-55-020(1)(d), 314-55-570(2). If an

5   applicant was not qualified, Ponder did not score the applicant. Reid Decl. ¶ 10. If an applicant

6   qualified for the Social Equity Program, Ponder validated an applicant's answers to the scoring

7   criteria and scored the applicant.

8       Ponder completed its review of all Social Equity applications on August 31, 2023, and

9   submitted a list of ineligible applicants, as well as a list of eligible applicants and their scores.

10  Reid Decl. ¶ 12. Ponder also provided the Board with its review spreadsheets, score sheets and

11  the documents submitted by each applicant. *Id.*

12      The Board notified applicants who did not qualify for the Social Equity Program or

13  whose score was too low to proceed by letter on September 17, 2023.

14  Reid Decl. ¶ 17. The Board issued a Statement of Intent to Withdraw Social Equity Cannabis

15  Retail Application (SOI) to applicants wishing to challenge the decision. The Board served the

16  SOI along with a form to request a formal administrative hearing pursuant to Wash. Rev. Code §

17  34.05.413. By statute, an applicant must file its formal request for a hearing within 20 days of

18  service of the SOI, or forfeit any challenge to the decision.[2]

19      Qualified applicants who had the highest scores in each county, or were selected by a

20  lottery,[3] were also notified on September 17, 2023 and allowed to start the licensing process.

21  This process included finding a location for their retail marijuana store within their selected

22  county and building out the location to meet legal requirements of the Board as well as the local

23

24      [2] Peridot did not appeal its denial, and the Board reserves the right to raise all potential defenses in its
    responsive pleadings to Peridot's Complaint, including, but not limited to, waiver and failure to exhaust
25  administrative remedies.
        [3] A double-blind lottery was used only in counties in which there more applications than available
26  licenses and there was a tie in scoring. A lottery was used in only two counties – Snohomish and Clark.
    Reid Decl. ¶ 13.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

5

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

jurisdiction, and purchasing required equipment. Once everything is in place, the Board conducts a final inspection of the location, and issues a license after payment of the license fee. To date, at least two applicants have acquired rights to specific locations, and have built out, or are in the process of building out their retail marijuana stores. Reid Decl. ¶ 14. The cost of these buildouts can range from $40,000 to $125,000. *Id*. An applicant also generally incurs the costs associated with buying or leasing the premises for its business.

**C.    Peridot's Application**

Peridot filed its application for a retail marijuana store under the Social Equity Program and its application was sent to Ponder for evaluation. In its answer to Ponder's questionnaire, Peridot indicated a majority owner (51%) had lived in a Washington disproportionally impacted area (DIA) for a minimum of 5 years, had been convicted of a cannabis offense, and had a household income less than the median household income ($82,400) within the state of Washington as calculated by the United States Census Bureau. It also answered the remaining Ponder questions used for scoring. Peridot Tree WA also submitted its documentation to validate its answers.

As part of the documentation submitted to Ponder, Peridot submitted information attempting to validate that its majority owner lived in a DIA in Michigan. The majority owner, Kenneth Gay, claimed to have lived in the same location for 20 years and that his address was designated as a disproportionately impacted area by Michigan. However, Peridot's complaint alleges only that Mr. Gay has lived in a disproportionately impacted area for more than two years and does not allege he lived in a qualifying area for five years, as required by Washington. *See*, ECF No. 1, ¶ 24. Further, Peridot Tree WA submitted no proof to Ponder and does not allege in its motion that Michigan's disproportionately impacted area criteria are identical to Washington's or specifying the periods in which the area of his residence was considered a disproportionately impacted areas.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

6

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1    At the end of August 2023, Ponder notified the Board that Peridot was not qualified for

2    the Social Equity Program because its members had not resided in Washington for the last six

3    months. Reid Decl. ¶ 19.

4    Based on Ponder's conclusion, on September 17, 2023, the Board sent a letter by email

5    to Peridot stating it was withdrawing Peridot's application because it did not meet minimum

6    qualifications and that it had 20 days to submit an appeal. Reid Decl., Ex. 1. Peridot Tree WA

7    did not submit an appeal, and the decision is now final and cannot be challenged.

8    ### III.    STANDARD OF REVIEW

9    The standard for issuing a TRO is identical to the standard for issuing a preliminary

10   injunction. *California Independent System Operator Corp. v. Reliant Energy Services, Inc*.,

11   181 F.Supp.2d 1111, 1126 (E.D. Cal. 2001). A preliminary injunction is an "extraordinary

12   remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*,

13   555 U.S. 7, 24 (2008) (citing *Munaf v. Greren*, 553 U.S. 674, 689-90 (2008)). The party seeking

14   injunctive relief bears the burden of making the *clear* showing that (1) it is likely to succeed on

15   the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the

16   balance of equities tips in its favor; and (4) an injunction is in the public interest.

17   *Dawson v. Asher,* 447 F.Supp.3d 1047, 1049  (W.D.WA. 2020). Heightened scrutiny applies

18   where an injunction, as here, would provide substantially all the relief the movant may recover

19   after a full trial on the merits. *Kikumura v. Hurley*, 242 F.3d 950, 955 (9th Cir. 2001).

20   A court may decline any injunctive relief, even when a Plaintiff is likely to prevail on the

21   merits, if the requested relief would inequitably impose harm on non-parties. *See, e.g*., *Finch v.

22   Treto*, 82 F.4th 572, 579 (7th Cir. 2023) (approving the district court's determination that granting

23   equitable relief would unacceptably harm non-parties). The court must balance the competing

24   claims and consider the effects on each party (and non-party), paying "'particular regard for the

25   public consequences in employing the extraordinary remedy of injunction.'" *Weinberger v.

26   Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

7

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1

### IV.    ARGUMENT

2      Plaintiff cannot meet its heavy burden for obtaining a TRO or a preliminary injunction.

3 First, it cannot make the necessary *clear* showing that it is likely to succeed on the merits when

4 this Court has already determined that the dormant Commerce Clause does not apply to

5 Washington's residency requirements under the same statute and program. Even if this Court

6 had not already determined this issue, Washington's residency requirements pose no

7 constitutional concerns. Peridot cannot show a likelihood of success on the merits. Second,

8 Peridot has not demonstrated that it will suffer any irreparable harm requiring emergency

9 injunctive relief. Nor do the equities favor Peridot; instead the equitable considerations weigh

10 heavily against the requested relief. Finally, the public concerns implicated by Peridot's

11 requested relief heavily favor the State. Should this Court find otherwise and issue a TRO,

12 Defendants request the Court order a bond sufficient to protect the impacted non-party Social

13 Equity applicants.

14      Both Plaintiff's TRO Motion and its Motion for Preliminary Injunction must meet the

15 same standard, and because the TRO Motion should be denied, this Court should also deny

16 Plaintiff's Motion for Preliminary Injunction and strike that Motion from the calendar.

17 **A.    Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits**

18      **1.    Peridot lacks standing to challenge Washington's Social Equity Program
             because it cannot show that but for the residency requirements it would have
19             received a license**

20      Peridot has not established standing in this lawsuit. The "irreducible constitutional

21 minimum" for Article III standing requires a plaintiff to demonstrate it has "(1) suffered an injury

22 in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

23 to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338

24 (2016).

25      In Washington, a Social Equity applicant first had to establish that it was eligible for

26 licensing, by meeting two of the three eligibility criteria set forth in Wash. Rev. Code. §

69.50.335 (2022) and meeting other licensing requirements, such as residency and age restriction. *See*, Wash Rev. Code § 69.50.331(1)(b). All eligible applicants were then scored according to a rubric that accounted for the various harms imposed by Washington's prosecution of drug offenses. Some, but not all, of those scoring criteria are related to residence in a "disproportionately impacted area" (DIA) in Washington.

Peridot cannot establish harm here because it has not shown that its score would have been sufficient to move forward in the licensing process, let alone that it would have been able to meet all the licensing requirements. In King County, the county in which it applied for a license, only eight licenses were available for 124 applicants who qualified for the Social Equity Program and who received a score. Decl. Reid ¶ 18.. The winning scores in King County ranged from 275 to 310 points. *Id*. To achieve such a score, an applicant would have to have met almost all the high-point requirements such as: living in a DIA for 10+ years (80 points in total), being convicted of a marijuana offense and serving time in prison or jail (120 points in total), having a household income under $82,400 (40 points), and also qualify for additional 35 points out of the remaining criteria. *Id*. Here, even if the residency requirements were removed, Peridot failed to establish its score could have been successful. For example, while Peridot's majority owner indicates that he lived at the same address for 20 years, there is no indication that address would have met Washington's statutorily required DIA criteria for any of those 20 years. Further, Peridot's majority owner was arrested for a marijuana offense, but does not assert he served time in jail or prison. Without serving time in jail or prison, he would be limited to only 20 out of the possible 80 points for a sentence related to a marijuana conviction. There is no basis to believe that, but for the challenged provisions, Peridot would have received a license.

The "traceability" criterion of Article III standing thus cannot be met because under the unchallenged provisions of Washington's Social Equity Program Peridot would have been unlikely to have had a score high enough to have its application in final consideration for one of the eight licenses. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (requiring a

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

9

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

"line of causation" between the defendant's action and the alleged harm). Likewise, a favorable ruling would not remedy Plaintiffs' alleged injury of not obtaining a license, which means the redressability criterion of Article III standing cannot be met as well. *See Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006); *Orion Wine Imps. LLC v. Appelsmith*, 837 F. App'x 585, 586 (9th Cir. 2021) (affirming dismissal of complaint where unchallenged provisions of California's Alcoholic Beverage Control Act would prohibit the plaintiff's proposed transaction). Without standing, no relief can be granted.

### 2.     This Court has already rejected Plaintiff's dormant Commerce Clause theory

Even if Peridot had standing, he cannot meet the exceptionally high burden for obtaining a TRO. Both a TRO and a preliminary injunction require a clear showing that the movant is "likely to succeed on the merits of their claims." *Dawson*, 447 F. Supp. 3d at 1051. Peridot cannot meet that standard here, because this Court has already rejected its claim that Washington's Residency Requirements violate the dormant Commerce Clause. *Brinkmeyer*, 2023 WL 1798173 (W.D. Wa. 2023).

In *Brinkmeyer* an Idaho resident who wished to "invest in and own cannabis retail stores in Washington" brought suit alleging that "Washington's residency requirements for obtaining a commercial cannabis license are facially unconstitutional." *Brinkmeyer* at *1-2. The plaintiff there challenged the same residency requirement challenged here: Wash. Rev. Code § 69.50.331(1)(b)(ii), (iii) and Wash. Admin. Code §§ 314-55-020(11) (2021), which prohibit the Board from issuing marijuana licenses to "a person… who has not lawfully resided in the state for at least six months prior to applying to receive a license."[4] *Id.* at 1; compare ECF No. 6 at 5, 8.

This Court, reviewing *Brinkmeyer's* challenge, found that the dormant Commerce Clause did not apply to Washington's residency requirements, because "the dormant Commerce Clause

---

[4] The general, statutory six-month residency requirement is reflected in the regulations specific to the Social Equity program adopted by LCB. Wash. Admin. Code § 314-55-370(2)(b).

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

10

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1    does not apply to federally illegal markets, including Washington's cannabis market and, thus,

2    it does not apply to Washington's residency requirements." *Brinkmeyer*, at *9.

3    Perhaps acknowledging that *Brinkmeyer* is fatal to its Motion, Peridot begins by ignoring

4    *Brinkmeyer* and ends by failing to distinguish it. First, Peridot neglects to include *Brinkmeyer* in

5    arguing that it is likely to prevail on the merits, failing to include it in its string cite of cases of

6    "every dormant Commerce Clause challenge to a cannabis licensing program," ECF No. 6 at 9.

7    Of course, *Brinkmeyer* was a "dormant Commerce Clause challenge to a cannabis licensing

8    program," and unlike the other cases cited by Plaintiff, involved a challenge to *these* licensing

9    requirements in *this* Court.

10   Peridot later attempts to distinguish *Brinkmeyer* as an effort to assume an active

11   marijuana license, while Peridot seeks to enjoin further issuance of marijuana licenses under the

12   Social Equity Program. ECF No. 6 at 15-16. Peridot argues that its injunction "supports, rather

13   than violates, the CSA." *Id.* But this is a misunderstanding of both the relief sought and this

14   Court's order in *Brinkmeyer*, which expressly rejected such reasoning. In *Brinkmeyer*, this Court

15   acknowledged that the plaintiff "asks the Court to enjoin the state from discriminating against

16   him, and other out-of-state residents, in its licensing application process." *Brinkmeyer,* at *4;

17   *compare with* ECF No. 6 at 15 ("[E]njoining the Department from using discriminatory criteria

18   in its licensing scheme would not compel any party to violate federal law... It would prevent

19   [state government] from discriminating against nonresidents...."). Peridot thus seeks the same

20   relief sought in *Brinkmeyer*.

21   *Brinkmeyer* squarely applies here.  That case, like this one, turned on whether the United

22   States Constitution provides rights to engage in Washington's entirely intra-state marijuana

23   market, which is illegal under federal law. And *Brinkmeyer*, in keeping with similar cases,

24   properly found that citizens do not "have a federal statutory or constitutional property right to

25   cannabis while it remains federally illegal." *Brinkmeyer*, at *8; *see also*, *Shelton et al., v. Liquor*

26   *and Cannabis Board of Washington State, et al*., No.21-5135 BHS, 2022 WL 2651617 (W.D.

DEFENDANTS' RESPONSE TO MOTION                    11          ATTORNEY GENERAL OF WASHINGTON
FOR TEMPORARY RESTRAINING                                     Licensing & Administrative Law Division
ORDER AND PRELIMINARY                                              800 Fifth Avenue, Suite 2000
INJUNCTION  -- NO. 3:23-CV-06111                                     Seattle, WA  98104-3188
                                                                         (206) 464-7676

Wash. July 8, 2022); *Vell Harris v. California Med. Forensic Serv.*, 2016 WL 5407820 at *3 (N.D.Ca. 2016) (finding no viable constitutional claim in denying the plaintiff access to medical marijuana while incarcerated: "no plausible federal claim can be drawn from plaintiff's allegations regarding the denial of his requests to use marijuana, which is illegal under the federal Controlled Substances Act."); *Vail v. City of Sacramento*, 2019 WL 3500518 at *5 (E.D. Ca. 2019) ("federal law does not recognize any protectable liberty or property interest in the cultivation, ownership, or sale of marijuana.").

As succinctly set forth in *Brinkmeyer*, no matter what relief it seeks, Peridot cannot rely on the dormant Commerce Clause to obtain it, because the dormant Commerce Clause does not encompass a right to engage in a market that Congress has forbidden. *Brinkmeyer*, at *9 ("citizens do not have a legal interest in participating in a federally illegal market."). That same logic applies not only to Washington's general six-month residency requirement, but also to the Social Equity Program's challenged scoring criteria.

As this Court has determined that the dormant Commerce Clause does not apply to Washington's residency requirements for obtaining a license to sell marijuana in the State, Peridot cannot carry its burden to show a clear likelihood of success on the merits.

### 3. Washington's residency requirements comport with dormant Commerce Clause requirements because they are narrowly tailored to achieve legitimate purposes

But even if this Court has not already determined the threshold legal issue of whether the dormant Commerce Claus applies in *Brinkmeyer*, Peridot would not be likely to succeed on the merits of its claims for multiple reasons.[5] Even if the dormant Commerce Clause applied to Washington's marijuana market, both Washington's general residency requirement and the Social Equity scoring rubric identifying disproportionately impacted areas within Washington survive dormant Commerce Clause scrutiny because they are narrowly tailored to achieve

---

[5] Because this is discussed in Section A.1 *supra* and discussed at length in *Brinkmeyer*, Defendants will not belabor these further.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

12

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

legitimate state interests. Washington's general residency requirements are tailored to achieve legitimate, permissible interests

Even if this Court finds the dormant Commerce Clause applies, it should find that the Residency Requirements are "narrowly tailored to advance a legitimate local purpose." *Tenn. Wine*, 139 S. Ct. at 2461-62 (internal quotations omitted). Here, the six-month residency requirement, in substance and duration, is narrowly tailored to maintain the tightly regulated Washington marijuana industry. Notably, Defendants are aware of no case in this Circuit in which a Court has sustained a dormant Commerce Clause challenge to a similar marijuana licensing system. Courts in this Circuit have either rejected such a claim (*Brinkmeyer*) or abstained from addressing the merits of the challenge. *Peridot Trees, Inc. et al., v. City of Sacramento*, No. 2-22-cv-00289_KJM-DB, 2022 WL 10629241 (E.D.Ca. Oct. 18, 2022); *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2023 WL 3493557, at *15-16 (C.D.Ca. April 11, 2023).

First, as this Court noted in *Brinkmeyer*, Washington has deliberately designed its marijuana market so that it is entirely intra-state. *Brinkmeyer*, at *12. The residency requirements are part-and-parcel of this effort. Washington forbids its marijuana licensees from exporting any marijuana outside its borders (or importing any marijuana from beyond its borders and forbids them from advertising in any media intended to reach beyond Washington's borders). Wash. Rev. Code § 69.50.325. In fact, Washington marijuana licensees are forbidden from selling to or purchasing from tribal entities located wholly within Washington's borders unless the State and the Tribe have reached an inter-governmental compact. Wash. Rev. Code § 69.50.3251.

Even wholly intra-state marijuana markets have led to at least one instance of litigation among the states. See *Nebraska v. Colorado*, 577 U.S. 1211, 1214 (2016) (in which Nebraska and Oklahoma claimed that Colorado's regulatory scheme "increased trafficking and transportation of Colorado-sourced marijuana" into their territories, requiring them to expend

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

13

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

significant "law enforcement, judicial system, and penal system resources" to combat the increased trafficking and transportation of marijuana).

The dormant Commerce Clause cannot be used to require Washington to potentially reward criminal behavior in other states. Under Peridot's reading of the clause, an Idaho resident would be entitled to apply for Washington's Social Equity Program, and, in order to maximize their potential points under the scoring rubric, would be encouraged to commit a marijuana or drug offense in Idaho, a state in which marijuana is wholly illegal. Thus, Washington law would be weaponized to incentivize an illegal interstate marijuana market in violation of both the CSA and the laws of other states. 21 U.S.C. §§ 841, 812(c)(Schedule 1)(c)(10); *Raich,* 545 U.S. at 22. Thus, an out of state resident may face criminal sanction for trafficking marijuana, and, under Peridot's argument, but Washington would be required to reward that behavior. This is a legally untenable outcome that could significantly undermine the relationships between the states.

While Washington's Social Equity Program accepts previous out-of-state arrests and convictions for current resident applicants, it carefully avoids undermining other states' policies by requiring that any licensee be a Washington resident. There is a world of difference between acknowledging a previous illegal act and encouraging a future one. The United States Constitution does not require that Washington do so.

Requiring Washington residency also allows the State to hold licensees responsible both through its regulatory process, and, if necessary, through criminal prosecutions. Bolender Decl. ¶ 2. Without a residency requirement, Board Enforcement Officers may be unable to complete investigations of out-of-state licensees because they have no jurisdiction or ability to travel out of state to conduct an investigation. Bolender Decl. ¶ 3. And the residency requirements ensure that a sufficient investigation can occur prior to licensing. Smith Decl. ¶¶ 13- 15. The Board investigates all applicants, including checking local databases, which include misdemeanors that a federal background check would not identify. Smith Decl. ¶ 13-14.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

14

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

Without Residency Requirements, the Board would lose insight from local authorities regarding an applicant. Smith Decl. ¶ 14. Knowing the character of a future marijuana owner is essential to know whether or not to license them. Smith Decl. ¶ 13.As recognized in *Brinkmeyer*, Washington is diligent in working to ensure that marijuana grown within its borders is not diverted to states where it remains illegal, and the residency requirements and investigations are necessary to achieve that. *Brinkmeyer* at *12 ("the residency requirements attempt to prevent any interstate commerce in cannabis and to prevent cannabis from Washington from moving into states where it remains illegal, like Idaho.").

Finally, the Residency Requirements are an integral part of Washington's prohibition on vertical integration and help to prevent control of the industry by a few large businesses. Smith Decl. ¶¶ 16-18. Unlike other states, Washington prohibits cross-tier ownership of cannabis licenses; a true party of interest in a producer or processor licensee is forbidden from being a true party of interest in a retailer licensee. Wash. Admin. Code § 314-55-328.

Without the residency requirements, Washington may unknowingly allow a producer/processor from another state to become a retailer in Washington or allow a person who already controls more than five marijuana licenses to obtain a Washington license. *Id.* Pointedly, Mr. Gay and Mr. Jensen, the owners of Peridot are the co-owners of at least one other cannabis business (in New York) and Mr. Gay is at least a part owner of numerous other cannabis businesses around the country.

Nor are the cases Peridot relies on availing. As a threshold matter, those decisions fundamentally misunderstand the dormant Commerce Clause in extending its protections to illicit markets. This Court's decision in *Brinkmeyer* was correct, those courts were not. *See also*, *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 560 (1st Cir. 2022) (Gelpi, J., dissenting) ("[A]ppellees should not be able to receive a constitutional remedy in federal court to protect the sale and distribution of a controlled substance which remains illegal under federal law.")

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

15

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1    The primary contrary case on this issue is *Ne. Patients Group v. United Cannabis*

2  *Patients & Caregivers of Maine*, from the First Circuit Court of Appeals. But that case is readily

3  distinguishable from this. First, it involved Maines's *medical* cannabis market, not a recreational

4  cannabis market, and that court relied on its reading of the Rohrabacher-Farr Amendment, as

5  effectively decriminalizing medical cannabis federally. *Ne. Patients Grp.*, 45 F.4th at 547-48.

6  Washington does not have a separate medical cannabis market; therefore that reasoning does not

7  apply. More importantly, this Circuit has rejected the First Circuit's reading of the Rohrabacher-

8  Farr Amendment. *See McIntosh*, 833 F.3d at 1179. Despite defunding enforcement, the Ninth

9  Circuit noted cannabis remains illegal under federal law. *Id.* at n.5; *see also Nixon*, 839 F.3d at

10  888.

11    Moreover, Maine did not labor to create an intrastate market, as Washington did. In fact,

12  Maine encouraged interstate activity in its cannabis market. *See Ne. Patients Grp.*, 45 F.4th at

13  547. This is in stark contrast to the pains Washington has taken to prohibit interstate cannabis

14  business. Peridot's reliance on *Toigo v. Department of Health and Senior Services*, 549

15  F.Supp.3d 985 (W.D. Mo. 2021), is similarly misplaced. That case also involved a medical

16  cannabis law. *Toigo*, 549 F.Supp.3d at 989. And that court simply assumed that the dormant

17  Commerce Clause applied to illicit markets, without further discussion. *Id.* at 990. In fact the

18  *Toigo* court incorrectly relied on a case as applying the CSA, when the Act was never mentioned.

19  *Id.* at 990 (incorrectly citing *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88,

20  104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), which involved timber processing regulations). The

21  Social Equity scoring criteria are narrowly tailored to achieve a legitimate purpose

22    Just as the general six-month residency requirement is necessary to achieve

23  Washington's legitimate purposes in regulating and overseeing its intra-state cannabis market,

24  the residency criteria in Washington's Social Equity program are narrowly tailored to achieve

25  that program's goals.

26

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

16

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

Washington's legislature created the Social Equity Program to ensure that the new intra-state cannabis market was "accessible to those most adversely impacted by the enforcement of drug-related laws, including cannabis-related laws." Laws of 2020, chpt. 236, § 1. And in Washington, "individuals in disproportionately impacted areas suffered the harms of enforcement of cannabis-related laws." *Id.* Washington laws were not enforced by Washington law enforcement officers in other states; they could not be. So, Washington could not evaluate what areas were disproportionately impacted by cannabis prohibition in other states, nor could it counter the impacts of those states' enforcement policies through Washington's law. It could only address the impacts of Washington's past within Washington.

Thus, Washington created the Social Equity Program to counter the most pernicious, long-term impacts of Washington's enforcement of drug laws and cannabis prohibition. Because Washington only has expertise in Washington, it appropriately limited its consideration of which areas were disproportionately impacted by Washington's laws to areas in Washington. Wash. Rev. Code § 69.50.335 (2022). Wash. Rev. Code § 69.50.335(6)(a). For instance, one criteria is that "The area has a high rate of arrest, conviction, or incarceration related to the sale, possession, use, cultivation, manufacture, or transport of illegal drugs." *Id.* Identifying these areas required gathering Washington court convictions from 1980-2010, an untenable, and perhaps impossible task to perform across all jurisdictions in the United States. Smith Decl. ¶¶ 8-9.

Importantly, apart from the general six-month residency requirement required of all licensees (and affirmed by *Brinkmeyer*) the Social Equity Program does not *require* that any applicant ever have resided in Washington. Indeed, Peridot's Social Equity owner could have qualified, if he lived in Washington. Applicants may receive points if they resided within a disproportionately impacted area in Washington, or if they operated a medical cannabis dispensary under Washington's since dissolved medical cannabis system. Wash. Admin. Code § 314-55-570(3)(c)(viii).

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

17

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

This is a system that is narrowly tailored to achieve the legitimate goal of ensuring that the people most harmed by Washington drug prohibition are able to access a newly decriminalized market. Even if the dormant Commerce Clause applies to this cannabis licensing scheme, it survives scrutiny, because there is no other means to achieve that interest. "The Commerce Clause… does not elevate free trade above all other values." *Maine v. Taylor*, 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed. 110 (1986). Washington's Social Equity Program does not preclude applicants who recently moved to Washington from receiving a Social Equity license; instead it provides some benefit to those residents who have been most harmed by Washington's prosecution of the drug war.

**B.      Plaintiff has Failed to Show a Likelihood of Irreparable Harm**

      **1.      Peridot's prolonged delay in bringing this action counsels against a finding of irreparable harm**

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action. . . ." *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278, 280 (S.D.N.Y. 1971). A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985). As the Eastern District recently recognized in denying a motion for a preliminary injunction, generally, "Plaintiffs' own delay in filing cannot form the basis for expeditious review of a preliminary injunction." *Jensen v. Biden*, No. 4:21-CV-5119, 2021 WL 10280381(E.D. Wa. Oct. 19, 2021) (citing *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). Denying the motion to expedite, the Court explained in *Jensen*, "Plaintiffs… provide no explanation as to why they have waited nearly two months after

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

18

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

the issuance of Governor Inslee's Proclamation… to file their motion seeking injunctive relief. *Id.* And a temporary restraining order is generally intended to prevent even more immediate harms. *See* FRCP 65(b)(1)(A) (requiring "specific facts" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition.").

Here, Peridot's delay in seeking injunctive relief highlights the lack of urgent need for its requested relief. Moreover, as explained further below, this significant delay in seeking relief tips any equitable considerations away from Peridot. This is particularly true given the nature of the injunction, which would require the Board to withhold imminent licenses from qualifying applicants, and to cause significant, concrete, potentially irreparable harm to non-parties.

Washington residency has been a prerequisite for a Washington marijuana license since Washingtonians voted to decriminalize cannabis in 2012. Wash. Rev. Code § 69.50.331; *see also* Initiative 502 (2012). Washington's legislature imposed the current six-month residency requirement in 2015 when it combined the regulated retail marijuana market with the legacy medical marijuana dispensary market. *See* Laws of 2015, chpt. 4 § 301. Now, more than eight years after that law went into effect, Peridot seeks this emergency injunctive relief.

Even if Peridot had no interest in pursuing a Washington marijuana license until the creation of Washington's Social Equity Program, *that* program was created in 2020. Laws of 2020, chpt. 236. The statutes governing the Social Equity Program have remained largely the same since their adoption more than three years ago. *Compare* Wash. Rev. Code § 69.50.335 (2022) *and* Laws of 2020, chpt. 236. The Board began its formal rulemaking process for implementing the Social Equity Program on April 13, 2022, and formally adopted its regulations

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION -- NO. 3:23-CV-06111

19

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7676

on October 12, 2022, which, by law, became effective on November 12, 2022, 13 months before

Peridot filed this action. Finally Peridot was alerted to the denial of its application on September

17, 2023, nearly three months before it filed the instant motion.

No matter how Peridot's delay is measured, it is lengthy: more than eight years from the

implementation of the six-month residency requirements; more than three years since the Social

Equity Program was created; 13 months since the regulations were adopted; and 82 days since

Peridot's application was denied.

Courts—including this Court—have routinely denied motions for preliminary injunctive

relief—let alone temporary restraining orders—based on delays that were comparable or shorter

in duration than even the most generous interpretation here. *See, e.g.*, *Red Shield Administration,*

*Inc. v. Kreidler*, No. C21-55551-RSM, 2021 WL 3630506, at *6 (W.D. Wash. Aug. 17, 2021)

(three-month delay); *Ozone Int'l, LLC v. Wheatsheaf Group Lmtd*, No. 2:19-cv-011108-RAJ,

2019 WL 3287081, at *3 (W.D. Wash. July 22, 2019) ; *Wise v. Inslee*, No. 2:21-CV-0288-TOR,

2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021) (two-month delay); *Bacon v. Woodward*,

No. 2:21-CV-0296-TOR, 2021 WL 5183059, at *6 (E.D. Wash. Nov. 8, 2021) (six-week delay).

Nor is this the first challenge Peridot's members have brought to a marijuana Social

Equity licensing law on this same legal theory. *See, e.g., Peridot Trees, Inc. et al., v. City of*

*Sacramento*, No. 2-22-cv-00289_KJM-DB, 2022 WL 10629241 (E.D.Ca. Oct. 18, 2022);

*Variscite NY One, Inc v. New York*, 640 F. Supp. 3d 232, 237 (N.D.N.Y. 2022); *Variscite, Inc.*

*v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2023 WL 3493557, at *15-16 (C.D.Ca.

April 11, 2023). Waiting until licensing agencies are on the verge of issuing licenses before

seeking injunctive relief—and thus threatening both the licensing schemes and the individuals

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

20

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

who relied on their apparent award of licenses—appears to be a tactical choice made by these litigants. Courts considering those previous TRO motions have regularly rejected them. *Variscite NY One, Inc v. New York*, 640 F. Supp. 3d 232, 237 (N.D.N.Y. 2022); *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2023 WL 3493557, at *15-16 (C.D.Ca. April 11, 2023). This Court should join those courts in refusing to countenance these tactics. *See Ozone Int'l, Inc.*, 2019 WL 3287081, at *3 ("The Court will not tolerate TRO engagement for the sole purpose of obtaining a tactical advantage.").

Peridot's extensive, unexplained delay militates strongly against the emergency relief it now seeks of stopping qualified non-party Washington businesses from opening their doors.

### 2. Plaintiff's harms are purely speculative, as it has not shown that it would otherwise have received a license

Citing to *American Trucking Associations, Inc*, Plaintiff wrongly asserts that the mere allegation of a violation of the Dormant Commerce Clause is sufficient to satisfy the irreparable harm prong of preliminary injunction analysis here. ECF No. 6 at 11. This is not so. Unlike in *American Trucking Associations, Inc*, Plaintiff's current claims are speculative at best. As argued above, Peridot failed to establish that but for Washington's Residency Requirements, it would have received a license. Therefore, unlike *American Trucking Associations, Inc.*, the Plaintiff's losses associated with the alleged violation are purely speculative. As a result, the mere allegation of a violation of the Dormant Commerce Clause and speculative monetary damages is insufficient to demonstrate irreparable harm.

The Central District of California reached that exact conclusion in denying a TRO brought by Mr. Gay and one of his other entities. *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2022 WL 1839751, at *11-12 (C.D.Ca. Dec. 8, 2022) ("Plaintiffs' argument that they will suffer irreparable harm are based on their speculation that they would be

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION -- NO. 3:23-CV-06111

21

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

able to successfully enter the commercial retail cannabis market, establish a loyal customer base, and make a profit...").

### 3. Injunctive relief is not appropriate when Peridot could apply for future rounds of licenses, if successful

Finally, there is no need for injunctive relief blocking the release of *these* licenses. In 2023, Washington's legislature passed SSB 5080, which authorized the creation of 52 additional retail cannabis licenses for the Social Equity program ("5080 licenses"). These 5080 licenses actually provide for greater flexibility and rights than current licenses. For instance, the licenses to be issued under 5080 are not tied to specific counties, but may locate to any jurisdiction that permits cannabis licensees. Wash. Rev. Code § 69.50.335(e)(i). Currently the Board has begun preliminary rulemaking for these new licenses, and projects that it will complete rulemaking by July, 2024. *Washington State Liquor and Cannabis Board Meeting* (December 6, 2023), (testimony of Cassidy West 15:45-16:40) (available at https://tvw.org/video/washington-state-liquor-and-cannabis-board-2023121044/?eventID=2023121044 *last accessed* December 9, 2023).

Should Peridot ultimately prevail in arguing that the dormant Commerce Clause applies to Washington's cannabis licenses, it may apply for—and potentially receive—one of those licenses. And, while Peridot makes much of the speculative injuries it may suffer from delay in issuing these licenses, it ignores the greater flexibility that the 5080 licenses unquestionably provide. Again, the Central District of California reached that exact conclusion in in denying a motion for preliminary injunction and TRO by a related entity "the probability that Plaintiffs may in the future become eligible under the licensing provisions eviscerates the likelihood of *irreparable* harm." *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2022 WL 1839751, at *11-12 (C.D.Ca. Dec. 8, 2022). Peridot has identified no irreparable harm requiring injunctive relief.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

22

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1  **C.    The Equities Weigh Sharply Against Peridot**

2       Even if Plaintiff satisfied the first two *Winter* factors—and it does not—the Court must

3  consider the potential impacts granting Plaintiff's proposed relief may cause the nonparties

4  implicated in this case. *Cassell v. Snyders,* 990 F.3d 539, 545 (7th Cir. 2021). The Court may

5  deny injunctive relief when it would impose inequitable consequences on non-parties. *See, e.g.,*

6  *Lewis v. Anderson*, 615 F.2d 778, 783 (9th Cir. 1979).

7       Indeed in one of the cases most relied upon by Plaintiff, *Finch v. Treto*, the court denied

8  a requested preliminary injunction precisely because of the harm to other potential cannabis

9  licensees. *Finch v. Treto*, 606 F.Supp.3d 811, 835-40 (N.D. Ill. June 9, 2022). In that case, a

10  recent transplant to Illinois (Finch) and a Pennsylvania resident (Toigo) alleged that Illinois's

11  cannabis licensing criteria violated the Dormant Commerce Clause because they required or

12  prioritized longtime Illinois residents. *Id.* at 819. They sought a preliminary injunction halting a

13  program  similar to Washington's Social Equity Program. *Id.*. Although the district court for the

14  Northern District of Illinois found that the residency requirements violated the Dormant

15  Commerce Clause, it denied the requested injunction because of its impact on the other

16  applicants. *Id.* at 838 ("Investments made in reliance on [the state's] process, and put in jeopardy

17  by Plaintiffs' request, are not unreasonable . . . [i]n fact, they are more substantial than any harm

18  Plaintiffs have shown that they are both likely to suffer if an injunction is denied and unlikely to

19  suffer if one is granted.").

20       Here, those equities are greater. Those 40 applicants and 10 title certificate holders who

21  were selected to move forward in the licensing process have already begun the process. Several

22  of these applicants have invested substantial funds in building out their retail stores. At least one

23  applicant has already invested $125,000. Further as applicants find suitable locations, they are

24  entering in to leases which will obligate them to continue to pay rent even if the ability to obtain

25  their license and open their business is stayed. The clear and non-speculative harm caused to

26  those selected months ago tip the balance of the inequities in Washington's favor.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

23

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

**D.      Emergency Injunctive Relief is Contrary to the Public Interest**

Any preliminary injunctive relief requires that the injunction be in the public interest. As discussed above, the relief sought would harm, perhaps irreparably, the 50 successful applicants for Social Equity licenses. Further, there is no general public benefit in changing Washington licensing requirements in a market for a federally illegal substance.

If this Court were to issue the limited requested injunctive relief, the *Brinkmeyer* decision would still support the imposition of Washington's six-month residency requirement and deny the Plaintiff its license. But the injunction would bar the most vulnerable applicants from receiving the license to which they are entitled and on which they have relied.

And, were the court to issue preliminary injunctive relief that prohibited enforcement, not only would there be competing—and contradictory—decisions from this Court, but Washington would be required to issue licenses to out-of-state residents who apply to assume a licenses during the pendency of these proceedings. While there is no vested property right in a Washington cannabis license, Wash. Admin. Code § 314-12-010 (1982); *Haines-Marchel v. Wash. Liquor & Cannabis Bd.*, 406 P.3d 1199, 1217 (Wash. 2017) (license to sell cannabis does not create a vested right), once a license is granted, there are significant administrative burdens in revoking a license. Thus, even were the Court to ultimately follow Judge Settle's reasoning in *Brinkmeyer*, if preliminary relief were granted the horses would be out of the barn and it would be extremely difficult, if not impossible to gather them back in.

The dormant Commerce Clause is intended to preserve competitive, *legal*, interstate markets. *Gen. Motors v. Tracey*, 519 U.S. 278, 299 (1997). It has no role in preserving *illegal* interstate markets. *Brinkmeyer*, at *11. And there is no public interest in relying on the inapplicable dormant Commerce Clause to prohibit the successful Social Equity applicants from receiving their licenses, or permitting this Plaintiff to participate in an illegal market.

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION -- NO. 3:23-CV-06111

24

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

**E.      If the Court issues a TRO, it Should Require a Bond Sufficient to Compensate the Affected Nonparties and the State of Washington**

If the Court decides to issue a TRO halting the Social Equity Program licenses, it should also require a bond from Plaintiff. Fed. R. Civ. P. 65(c). The Court has "wide discretion in settling the amount of a security bond." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). Here, the requested TRO would potentially harm the interests of the 50 approved applicants each of whom invested significant time, effort, and resources into not only their applications, but several have already spent significant funds attempting to complete the licensure process. These resources include potentially significant initial investments, such as retaining compliant properties, building out properties, applying for local licensing and zoning approval, and obtaining final inspection reports and approval. One approved applicant who is on the brink of its license approved has spent more than $125,000 on buildout of their approved location; another spent $40,000. Those licenses will issue imminently; any injunctive relief will impose concrete harms on these nonparties. While not all applicants have expended the same amount as those closest to licensure, all have expended significant resources and effort. Therefore, the state requests that the Court order a bond of at least $30,000 for each of the 50 approved Social Equity applications for a total $1,500,000.00.

Finally, while Plaintiff asserts that it is a small business owned entirely by a "low-income individual [Mr. Gay] and one other individual [Mr. Jensen]" they neglect to mention that Mr. Gay apparently is an owner of a string of marijuana businesses across the country, including one that he apparently co-owns with Mr. Jensen, Variscite NY One, Inc. *See* Pitel Decl. ¶ 3, Ex. 2. Given the complex, interrelated string of entities involving both Mr. Gay and Mr. Jensen, and the readily apparent need to ensure that the affected non-parties are protected, a bond of at least $1,500,000.00 is appropriate.

DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION  -- NO. 3:23-CV-06111

25

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

1

**V.    CONCLUSION**

2          This Court should not use its equitable powers to issue a TRO that will substantial harm

3  other applicants, impair Washington's legitimate and paramount interests in public health and

4  safety, and is based on a legal theory previously rejected by this Court. The Residency

5  Requirements are a necessary foundation for Washington's proper stewardship, in regulating a

6  controlled substance and integral part of remedy the past harms of Washington's war on drugs.

7  This Court should deny Peridot's request for a TRO and preliminary injunction.

8

9

10                      **Word Count Certification**

11

12          I certify that this memorandum contains 8127 words, in compliance with the Local

13  Civil Rules.

14

15  DATED this 10th day of December, 2023.

16                                  ROBERT W. FERGUSON
                                    Attorney General
17

18                                  JONATHAN PITEL, WSBA #47516
19                                  *Assistant Attorney General*
                                    PENNY L. ALLEN, WSBA #18821
20                                  *Senior Counsel*
                                    Counsel for Defendants
21                                  1125 Washington St SE
                                    Olympia, WA 98504-0110
22                                  Phone: (360) 753-2702
                                    E-mail: Jonathan.Pitel@atg.wa.gov
23                                          PennyL.Allen@atg.wa.gov
                                            LALOlyEF@atg.wa.gov
24

25

26

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION -- NO. 3:23-CV-06111

26

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676

**CERTIFICATE OF SERVICE**

I, Jonathan E. Pitel, hereby certify that on December 10, 2023, I caused the foregoing **Response to Motion for Temporary Restraining Order and Preliminary Injunction, Declaration of Nicola Reid** with **Exhibit 1, Declaration of Captain Bolender, Declaration of Rebecca Smith** with **Exhibits 1-4,** and **Declaration of Jonathan Pitel** with **Exhibits 1-2,** to be served upon the below listed counsel for Plaintiff:

Via CM/ECF portal:

Jimmy Garg
300 Lenora Street #1063
Seattle, WA 98121

Jeffery M. Jensen
9903 Santa Monica Blvd #890
Beverly Hills, CA 90212

I certify under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 10th day of December 2023, at Olympia, WA.

_____
JONATHAN E. PITEL, WSBA # 47516
Assistant Attorney General

DEFENDANTS' RESPONSE TO MOTION
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION  -- NO. 3:23-CV-06111

27

ATTORNEY GENERAL OF WASHINGTON
Licensing & Administrative Law Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7676