UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PERIDOT TREE WA INC, | Case No. 3:23-cv-06111-TMC |
| Plaintiff, | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| WASHINGTON STATE LIQUOR AND CANNABIS CONTROL BOARD; WILLIAM LUKELA, | |
| Defendants. | |

## I.    INTRODUCTION

In 2020, the Washington State legislature established a Social Equity Program for awarding retail cannabis licenses that aimed to help those applicants most adversely impacted by previous drug prohibition laws enter the State's legal cannabis market. Through its eligibility criteria and scoring rubric, the program favors applicants who have lived in areas of Washington that were disproportionately impacted by prosecution of cannabis offenses, have been arrested for or convicted of a cannabis offense, and earn below-median income. The program requires applicants to have resided in Washington for at least six months, and the rubric favors those who have lived in a disproportionately impacted area in Washington for a long period of time.

Plaintiff Peridot Tree's ("Peridot") majority owner/shareholder is a Michigan resident who has lived in a disproportionately impacted area in Michigan for over twenty years, was convicted of a cannabis-related offense under Michigan law, and earns an income that falls below Washington's median. Peridot applied for a Social Equity Program license in Spring 2023, but the Washington State Liquor and Cannabis Board rejected its application for failure to meet the minimum residency qualifications.

Peridot challenges the Social Equity Program's provisions that require or favor Washington residency, arguing that they violate the dormant Commerce Clause. Shortly after filing this lawsuit, Peridot moved for preliminary injunctive relief, asking this Court to enjoin the Liquor and Cannabis Board from issuing final licenses to the successful Social Equity Program applicants. Dkt. 6. While recognizing that courts around the country have split on the question, this Court concludes that Peridot is unlikely to succeed on the merits because the dormant Commerce Clause does not protect a right to participate in an interstate market that Congress has declared illegal. For this reason, and for those explained further below, the Court DENIES Peridot's motion for a preliminary injunction.

## II.   BACKGROUND

Plaintiff Peridot Tree WA, Inc. ("Peridot") is an applicant for a retail cannabis dispensary license from the State of Washington through its Social Equity Program. Defendants are the Washington State Liquor and Cannabis Board (the "LCB") and William Lukela in his official capacity as Director of the LCB. The following facts are undisputed by the parties.

**A.    Sale of Cannabis under Federal Law**

Under the Controlled Substances Act ("CSA"), it is unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," including cannabis. 21 U.S.C. § 841(a)(1); *see* 21 U.S.C. § 812(c) (classifying

cannabis as a Schedule I substance). Although cannabis remains illegal under federal law, the federal government generally does not prosecute the sale of cannabis that complies with state law. *See* Dkt. 18 ¶ 12.

In 2013, following the legalization of cannabis in Colorado and Washington, U.S. Deputy Attorney General James Cole issued a memorandum entitled "Guidance Regarding Marijuana Enforcement" (the "Cole Memo"). Dkt. 18-1. The memorandum directed U.S. Attorneys to prioritize the following enforcement priorities: Preventing "the distribution of marijuana to minors;" "revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;" "the diversion of marijuana from states where it is legal under state law in some form to other states;" "state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or illegal activity;" "violence and the use of firearms in the cultivation and distribution of marijuana;" "drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;" "the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands;" and "marijuana possession or use on federal property." *Id.* at 2–3. The memorandum stated that jurisdictions that have legalized cannabis and have strong regulatory and enforcement systems are "less likely to threaten the[se] federal priorities." *Id.* at 3. The memorandum instructed U.S. Attorneys to focus their enforcement resources and efforts, including prosecution, on persons or organizations whose conduct interferes with any one or more of these priorities, regardless of state law. *Id.* at 2. It further directed them, when exercising prosecutorial discretion, to consider whether a cannabis "operation is demonstrably in compliance with a strong and effective state regulatory system" and "whether the conduct at issue implicates one or more of the enforcement priorities." *Id.* Although Attorney General Jeff

Sessions rescinded the memorandum, the Department of Justice has continued its practice of prosecutorial discretion in states that have legalized cannabis. *See* Dkt. 18-2 at 1–3.

**B.      Sale of Cannabis under Washington State Law**

In 2012, Washington voters enacted Initiative Measure 502 ("I-502"), legalizing the possession and sale of cannabis.[1] Dkt. 18 ¶ 1. I-502 authorized the LCB to regulate and tax Washington's cannabis market. I-502 § 1(3); Dkt. 18 ¶ 2 (citing 2013 Wash. Sess. Laws 29; RCW §§ 69.50.331(4), .342, .345 (2013)).

Businesses and individuals must have a license from the LCB to sell or distribute cannabis in Washington. RCW § 69.50.3251(1). Washington voters approved a residency requirement for cannabis licenses when they voted to legalize cannabis in 2012. Dkt. 18 ¶ 3; I-502 § 6(b) (requiring residency in Washington for at least three months); RCW § 69.50.331(1)(b) (2012) (same). Washington has had a six-month residency requirement since 2015, when the State merged the retail and medical cannabis markets. RCW § 69.50.331(1)(b) (2015). Under the current regulation, the LCB may not issue a license to anyone who does not meet the following age and residency requirements:

(i) A person under the age of 21 years;

(ii) A person doing business as a sole proprietor who has not lawfully resided in the state for at least six months prior to applying to receive a license;

(iii) A partnership, employee cooperative, association, nonprofit corporation, or corporation unless formed under the laws of this state, and unless all of the members thereof are qualified to obtain a license as provided in this section; or

(iv) A person whose place of business is conducted by a manager or agent, unless the manager or agent possesses the same qualifications required of the licensee.

---

[1] *Available at* https://www.sos.wa.gov/_assets/elections/initiatives/i502.pdf.

RCW § 69.50.331(1)(b). The LCB must perform a residency check to confirm license applicants meet the six-month Washington state residency requirement. WAC 314-55-020(1)(d).

Rebecca Smith, the LCB's Director of Licensing, attests that these "[r]esidency [r]equirements are a necessary component of Washington's strong and effective regulatory and enforcement systems for its regulated marijuana industry." Dkt. 18 ¶ 11. They help Washington meet the enforcement priorities set out in the Cole Memo and ensure Washington's cannabis "enforcement efforts are sufficiently robust to protect against the harms." *Id.* (quoting Dkt. 18-1); *see also* Dkt. 18-4 at 5–6 ("Many marijuana regulations are justified as necessary to comply with the federal government's marijuana enforcement priorities laid out in the Cole Memo . . . . Related to residency requirements is the priority of '[p]reventing the diversion of marijuana from states where it is legal under state law in some form to other states.'"). "[A]s a result, [the residency requirements] help to prevent federal interference in [Washington's] market" or regulatory structure. Dkt. 18 ¶ 11. Smith further explains that states without residency requirements tend to experience an overproduction of cannabis, which leads to diversion to other states. *Id.* ¶ 20.

**C.    Social Equity Program**

In 2020, the Washington Legislature created the Social Equity Program as an effort "to reduce barriers to entry to the cannabis industry for individuals and communities most adversely impacted by the enforcement of cannabis-related laws," and to "establish[] a cannabis industry that is equitable and accessible to those most adversely impacted by the enforcement of drug-related laws, including cannabis-related laws." 2020 Wash. Sess. Laws Ch. 236 § 1(1). The Social Equity Program established that the LCB would reserve cannabis retail licenses exclusively for social equity applicants. RCW § 69.50.335(1)(a), (2)(a).

The LCB adopted the Social Equity Program criteria and application process in October 2022, and those regulations became effective the following month. *See* WAC 314-55-570 (2022). Each applicant must meet the following criteria to be considered for the Social Equity Program:

> (b) At least a 51 percent majority, or controlling interest, in the applicant, must be held by a person, or persons, who has or have resided in Washington state for six months prior to the application date, consistent with RCW 69.50.331, and meets at least two of the following qualifications:
>
> > (i) Qualification 1: The social equity applicant or applicants have lived in a disproportionately impacted area in Washington state for a minimum of five years between 1980 and 2010; or
> >
> > (ii) Qualification 2: The social equity applicant or a family member of the applicant has been arrested or convicted of a cannabis offense; or
> >
> > (iii) Qualification 3: The social equity applicant's household income in the year prior to submitting the application was less than the median household income within the state of Washington as calculated by the United States Census Bureau.

WAC 314-55-570(2). "Disproportionately impacted area" means:

> [A] census tract within Washington state where community members were more likely to be impacted by the war on drugs. These areas are determined using a standardized statistical equation to identify areas of high unemployment, low income, and demographic indicators consistent with populations most impacted by the war on drugs, including areas with higher rates of arrest for drug charges. The board will provide maps to identify disproportionately impacted areas. The maps will reflect census tracts from different time periods to account for gentrification.

WAC 314-55-570(1)(a). The LCB posted maps identifying disproportionately impacted areas in Washington by decade from 1980 to 2010. Dkt. 7-3 at 1. The LCB evaluates applications according to the following rubric:

| Social Equity Application Scoring Rubric | | |
|---|---|---|
| **Category** | **Eligibility Requirements** | **Point Scale** |
| | 1. Lived in a disproportionately impacted area (DIA) | 40 |
| | 1a. How long have you lived in a DIA? <br><br> 5y -10y = 20 points <br><br> 10 + years = 40 points | 40 |
| | 2. Convicted of a drug offense? (Self) | 10 |
| | 2a. Convicted of a cannabis offense? (Self) | 40 |
| | 3. Convicted of a drug offense? (Family) | 5 |
| | 3a. Convicted of a cannabis offense? (Family) | 5 |
| | 4. If you were convicted of a cannabis offense, what type of sentence did you receive: <br><br> Fine = 10 points <br><br> Served probation = 20 points <br><br> Confined to home = 40 points <br><br> Served time in jail or prison = 80 points | 80 |
| | 5. Did you or your family member's incarceration keep you from getting employment? | 5 |
| | 6. Did you lose your home or ability to purchase a home or rent a home as a result of your convictions or arrests? | 5 |
| | 7. Is your household income less than the median household income within the state of Washington as calculated by the United States Census Bureau? | 40 |
| | 8. Did you own or operate a medical cannabis dispensary or collective garden, licensed as a business, prior to July 1, 2016 (10 points)? <br><br> or <br><br> Did you own and operate a medical cannabis dispensary or collective garden licensed as a business in a DIA (30 points)? | 10 <br><br><br><br> 30 in a DIA |
| | 9. Have you held or do you currently hold 51 percent majority/controlling interest of a state cannabis (marijuana) retailer license? <br><br> No = 10 points <br><br> Yes = 0 points | 10 |
| | **Total Maximum Points** | **310 points** |

WAC 314-55-570(3)(c)(viii).

From March 1 to April 27, 2023, the LCB accepted applications for a total of 46 social equity licenses in 22 counties. Dkt. 7-1 at 1; Dkt. 7-2 at 1–2. Eight social equity licenses were available in King County. Dkt. 7-2 at 2. The LCB sent the applications to Ponder Diversity Group ("Ponder"), a third-party contractor, for evaluation. Dkt. 16 ¶¶ 7–8. Ponder required applicants to submit an online application and questionnaire, as well as supporting documentation. *Id.* ¶ 9. Ponder reviewed applications to determine which met the minimum requirements for licensure and the Social Equity Program. *Id.* ¶ 10. It then verified the eligible applications and scored them according to the LCB rubric. *Id.* ¶¶ 10–11. It did not further review ineligible applications. *Id.* ¶ 10. On August 31, 2023, Ponder sent the LCB the results of its evaluation, as well as the review spreadsheets, score sheets, and application materials and documentation. *Id.* ¶ 12. On September 17, 2023, the LCB notified the applicants, including 40 successful applicants, of the results by email. *Id.* ¶¶ 13, 17; *see* Dkt. 7-5.

LCB's emails to the successful applicants informed them that they were allowed to continue the licensing process. Dkt. 16 ¶ 13. Two of these applicants have informed the LCB that they have found storefront locations for rent. *See id.* ¶ 14. One of the two applicants is building out its store for a cost of $125,000. *Id.* The other has completed building out the store, which has passed its final inspection, and has spent $40,000; paying the licensure fee is the only remaining step for that applicant to receive a license. *Id.* The other successful applicants have not informed the LCB whether they have acquired a space or purchased equipment. *See id.* ¶ 15.

Peridot applied for a license in King County through the Social Equity Program. *See* Dkt. 7 ¶ 3; Dkt. 16 ¶ 18. On September 17, 2023, the LCB notified Peridot that its application was withdrawn for failure to meet the minimum qualifications. Dkt. 7-5; Dkt. 16 ¶ 19. Peridot asserts

that it meets all application requirements except those favoring Washington residents. Dkt. 27 ¶ 22; Dkt. 6 at 6. Specifically, Peridot asserts that Kenneth Gay, who owns 51 percent of Peridot, has lived in a disproportionately impacted area in Michigan for over twenty years and was convicted of a cannabis offense under Michigan law. Dkt. 27 ¶ 24; Dkt. 6 at 6 (citing Dkt. 8 ¶¶ 4, 6). Defendants also note that Peridot indicated in its application materials that its majority owner's household income was less than the median household income in Washington. Dkt. 15 at 6.

**D.    Procedural History**

Peridot filed a complaint with this Court on December 4, 2023 (Dkt. 27) and moved for a Temporary Restraining Order and Preliminary Injunction on December 8, 2023 (Dkt. 6). The Court denied the motion for a Temporary Restraining Order in an oral ruling on December 14, 2023. Dkt. 23. On December 22, 2023, Peridot filed an amended complaint. Dkt. 27. The Court held oral argument on December 29, 2023.

Having considered the parties' briefs, the record, applicable law, and oral argument, the Court DENIES Peridot's motion for preliminary injunction.

## III.    DISCUSSION

**A.    Preliminary Injunction Legal Standard**

A preliminary injunction "is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quotation marks and citations omitted).

To obtain a preliminary injunction, a plaintiff must establish: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest."

*Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The movant must make a showing on each element of the *Winter* test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, "[i]t is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury." *Baird*, 81 F.4th at 1040. In such cases, establishing the first prong also "usually demonstrates [the movant] is suffering irreparable harm no matter how brief the violation" and "tips the public interest sharply in his favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (citing *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). Thus, when constitutional claims are at issue, the Court may not "skip over" the first prong and decide the case only on the other elements because of the "influence" that establishing the first prong has on the other factors. *Baird*, 81 F.4th at 1044, 1046. However, a plaintiff may also compensate for a weaker showing of the first prong with a stronger showing of the balance of equities prong. *See Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) ("[W]here the 'balance of hardships . . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits." (quoting *All. for the Wild Rockies*, 632 F.3d at 1135)).

"[T]he mere allegations of a complaint" do not suffice to obtain a preliminary injunction, *Takiguchi v. MRI Int'l, Inc.*, 611 F. App'x 919, 921 (9th Cir. 2015) (citing *Winter*, 555 U.S. at 20), but the evidence submitted in support "need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, No. 2:16-cv-05719-SVW-JC, 2016 WL

9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Neither party here has challenged the evidence submitted in support or opposition to the motion and the underlying facts are undisputed. The parties' arguments focus instead on questions of law.

**B.    Standing**

Defendants argue that Peridot lacks Article III standing. Dkt. 15 at 8. Article III of the U.S. Constitution limits the Court's jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the party bringing the case must have standing. *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021), *cert. denied sub nom.*, *Hollingsworth v. Perry*, 143 S. Ct. 301 (2022) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013)). The "irreducible constitutional minimum" of Article III standing requires the plaintiff to show the following three elements: "(1) [The plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016); *see also Perry*, 18 F.4th at 630.

As the party invoking the Court's jurisdiction, the plaintiff "bears the burden of establishing these elements." *Spokeo*, 578 U.S. at 338. "At the preliminary injunction stage, the plaintiff must make a clear showing of each element of standing, relying on the allegations in their complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (internal quotation marks and citations omitted)). "The plaintiff[] 'must demonstrate standing separately for each form of relief sought,' and the 'remedy must be tailored to redress [their] particular injury,'" *Id.* (fist quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000), and then quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352

(2006) (holding the plaintiff must show standing "for each claim" and "each form of relief sought").

Injury in fact is the "[f]irst and foremost" of the three elements. *Spokeo*, 578 U.S. at 338. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A concrete injury is one that is "real, and not abstract" *Spokeo*, 578 U.S. at 340 (internal quotation marks omitted). But "intangible harm" and "the risk of real harm" can satisfy the concreteness requirement. *Id.* at 340–41; *see also Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018). "A 'particularized injury' is one that 'affect[s] the plaintiff in a personal and individual way.'" *Safer Chems., Healthy Fams. v. U.S. Env't Prot. Agency*, 943 F.3d 397, 411 (9th Cir. 2019) (quoting *Spokeo*, 578 U.S. at 339). "[S]tanding does not require exercises in futility." *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002).

To be fairly traceable to the challenged conduct, "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. To be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted).

Defendants argue that because Peridot likely would not have scored high enough to receive one of the eight King County licenses, it cannot show that "but for the challenged provisions, it would have received a license," and therefore, Peridot has not established harm, traceability, or redressability. Dkt. 15 at 9–10.

Peridot responds that whether its application would have scored high enough to obtain a license is immaterial, because LCB rejected its application based solely on the residency

requirement and that unconstitutional exclusion from the program is enough to establish standing. Dkt. 25 at 6–7.

Peridot has satisfied each of the three elements of standing. First, Peridot alleges an injury in fact. *See Perry*, 18 F.4th at 630. Peridot's alleged injury, exclusion from the competitive application process, is concrete and particularized. LCB eliminated Peridot's application at the screening stage for failure to meet the residency requirement, thus denying Peridot the opportunity to participate in the competitive process. Exclusion from the competitive process is itself a concrete injury. *See Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-CV-00289-KJM-DB, 2022 WL 10629241, at *3 (E.D. Cal. Oct. 18, 2022) ("Winning the 100-meter dash is no guarantee of a podium finish in a decathlon, but an athlete who is wrongly barred from starting that race has certainly been hampered in her hunt for the overall gold. [Plaintiffs] similarly fell out of the race right from the start. Here, there is a concrete injury in the necessary sense."); *NPG, LLC v. City of Portland*, No. 20-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("[Plaintiffs'] alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's [policy]."); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (determining plaintiff not required to prove he would have been admitted to medical school but for challenged race-based admissions program because university denied him opportunity to compete for all slots in class). As to Peridot's claims challenging the scoring criteria that favor residents but do not exclude others, ability to compete evenly also constitutes injury in fact. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("[T]he "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract."). Thus, whether Peridot would have scored highly enough to receive a license even without the criteria favoring Washington

residents is immaterial; deprivation of the right to participate and compete evenly in the application process constitutes an injury in fact.

Second, Peridot satisfies the traceability element. *See Perry*, 18 F.4th at 630. LCB's decision to reject Peridot's application for failure to meet the residency requirements caused Peridot's exclusion from the competitive process.

Third, Peridot's alleged injury is redressable. Whether a claim is redressable depends on whether the court is capable of providing relief that redresses the injury, and not whether the plaintiff's proposed relief redresses the injury. *See Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017) ("[Plaintiff's] proposed injunction does not control whether her claims are redressable. The district court is not bound by [plaintiff's] proposal, and may enter any injunction it deems appropriate, so long as the injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (internal quotation marks omitted)). Thus, even if Peridot's requested preliminary relief—enjoining Defendants from issuing the current round of Social Equity Program licenses—would not redress its alleged injury, the Court could redress Peridot's injury by enjoining Defendants from applying criteria that requires or favors Washington residency in future rounds of applications.

Defendants cite *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n.*, 457 F.3d 941 (9th Cir. 2006) and *Orion Wine Imps., LLC v. Appelsmith*, 837 F. App'x 585 (9th Cir. 2021) to support their argument that a favorable ruling would not remedy Peridot's alleged injury. Dkt. 15 at 10. In both cases, unchallenged regulatory provisions would have caused the same alleged injury to the plaintiff as the challenged provisions, even if the court struck the challenged provisions. *Nuclear Info.*, 457 F.3d at 955; *Orion Wine Imps.*, 837 F. App'x at 586. Defendants argue that unchallenged provisions of Washington's Social Equity Program—presumably the location-neutral rubric criteria—mean that "Peridot would have been unlikely to have had a

score high enough to have its application in final consideration for one of the eight licenses." Dkt. 15 at 9. But as the Court discussed previously, Peridot's alleged injury is exclusion from the competitive process, and not denial of a license. No unchallenged rubric criterion or other regulatory provision would definitively disqualify or outright exclude Peridot from the competitive process, and Peridot's success would depend on the other applicants under consideration.

Peridot has therefore established standing to seek a preliminary injunction on its dormant Commerce Clause claims challenging the Washington regulations that require or favor residency to acquire a cannabis retail license.

## C.    Peridot cannot show a likelihood of success on the merits.

The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has long held that the Commerce Clause "also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019); *see also Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 444 (9th Cir. 2019). Courts refer to "[t]his 'negative' aspect of the Commerce Clause" as the "dormant Commerce Clause." *Id.* (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

Because the dormant Commerce Clause is a judicially-created doctrine that is implied from the intent of the Commerce Clause rather than found in its text, the Supreme Court has long focused on the purpose of the doctrine to interpret its limits. The "fundamental objective" of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997). By "prevent[ing] the States from adopting protectionist measures," the dormant Commerce Clause "preserves a national market for goods

and services." *Tenn. Wine & Spirits Retailers*, 139 S.Ct. at 2459; *see also Tracy*, 519 U.S. at 287 (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980)) ("[The dormant] Commerce Clause prohibits taxation or regulation that discriminates or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" (internal citations omitted)).

Courts follow a two-tiered approach to reviewing challenges to local regulations under the dormant Commerce Clause:

> (1) When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. (2) When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Id.* (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). "A discriminatory law is virtually per se invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (internal citations and quotation marks omitted); *see, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 151 (1986) (upholding ban on importation of baitfish into Maine because it served "legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives").

Peridot argues that LCB's regulations requiring Washington residency or favoring Washington residents violate the dormant Commerce Clause because they discriminate against out-of-state applicants. Dkt. 6 at 7–9. Peridot contends that these regulations do not advance a legitimate local purpose that cannot be served by a reasonable nondiscriminatory alternative. *Id.* at 10. But Peridot's arguments all rest on the assumption that the traditional dormant Commerce Clause analysis applies to the cannabis market despite that market remaining illegal under federal law.

Peridot does not cite any Ninth Circuit or district court decision within the Ninth Circuit that holds the dormant Commerce Clause bars a residency preference or requirement for a cannabis retail license. This District is the only court within the Ninth Circuit that has squarely addressed this question, and it did so with respect to one of the same regulations that Peridot challenges here. In that case, *Brinkmeyer v. Washington State Liquor & Cannabis Board*, No. C20-5661 BHS, 2023 WL 1798173, at *11 (W.D. Wash. Feb. 7, 2023), *appeal dismissed*, No. 23-35162, 2023 WL 3884102 (9th Cir. Apr. 11, 2023), the Honorable Benjamin H. Settle held that the dormant Commerce Clause did not apply to Washington's six-month minimum residency requirement for cannabis licenses under RCW 69.50.331(1)(b)(ii). Judge Settle reasoned that citizens have neither "a federal statutory or constitutional property right to cannabis while it remains federally illegal," nor "a legal interest in participating in a federally illegal market." *Id.* at *10–11. He further explained that although the dormant Commerce Clause "serves an important purpose—limiting economic protectionism by states," maintaining a free national market is not in the public interest "'when Congress has explicitly acted to make the market in question illegal.'" *Id.* at *11 (quoting *Ne. Patients Grp.*, 45 F.4th at 559 (Gelpí, J. dissenting)). Judge Settle concluded that "[t]he dormant Commerce Clause does not apply to federally illegal markets, including Washington's cannabis market and, thus, it does not apply to Washington's residency requirements." *Id.*

In arguing that this Court should not follow *Brinkmeyer*, Peridot leans heavily on the First Circuit, which is so far the only circuit court to have addressed this issue and held that the dormant Commerce Clause barred a residency requirement for officers and directors of medical cannabis dispensaries in Maine. *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542 (1st Cir. 2022). The court found that an interstate medical cannabis market existed even though that market was illegal federally. *Id.* at 547. The court further concluded that

"given the nature of the specific federal legislative context in which this case arises," Congress's affirmative exercise of its Commerce Clause power to regulate (through criminalization) the medical cannabis market does not nullify the applicability of the dormant Commerce Clause to the same market. *Id.* at 548. The court also rejected the defendants' argument that the challenged state regulation did not violate the dormant Commerce Clause because Congress impliedly consented to it through the Controlled Substances Act. *Id.* at 551.

But *Northeast Patients Group* dealt solely with medical cannabis, and the court based its holding in part on the impact of Congress's action through the Rohrabacher-Farr Amendment, which prohibits the Department of Justice from using its appropriated funds to prevent states from implementing laws legalizing medical cannabis. *See id.* at 553–56 (citing Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, § 530 (2022) ("Rohrabacher-Farr Amendment")). In the First Circuit's view, the Rohrabacher-Farr Amendment demonstrates a congressional "expectation that an interstate market [in medical cannabis] would continue to operate," *id.* at 553, and the existence of the market alone is sufficient to trigger dormant Commerce Clause protection. To the extent that *Northeast Patients Group* hinges on the impact of the Rohrabacher-Farr Amendment, this case is distinguishable; that amendment applies only to medical cannabis, and in contrast, the exercise of discretion by the executive branch to refrain from prosecuting retail cannabis sales that are legal under state law cannot demonstrate Congress's intent with respect to its Commerce Clause authority.

But more importantly from this Court's perspective, the majority decided *Northeast Patients Group* over a dissenting opinion in which Judge Gelpí persuasively argued that the dormant Commerce Clause does not apply to federally illegal markets: "The Commerce Clause does not recognize an interest in promoting a competitive market in illegal goods or services or forestalling hypothetical interstate rivalries in the same." *Id.* Judge Gelpí reasoned that the

dormant Commerce Clause presumes that "the public interest is best served by maintaining an unencumbered 'national market for competition' in legal goods and services. However, it makes little sense to retain this presumption when Congress has explicitly acted to make the market in question illegal." *Id.* (internal citations omitted). He contended that "illegal markets are constitutionally different in kind" than legal markets, and thus disagreed with the majority "that the Commerce Clause protects the free-flowing operation of national markets that Congress has already made illegal through its Commerce Clause power." *Id.* at 559 (Gelpí, J., dissenting).

This Court agrees with the analysis in *Brinkmeyer* and Judge Gelpí's *Northeast Patients Group* dissent. The purpose of the dormant Commerce Clause is to preserve a competitive interstate market. *See Tracy*, 519 U.S. at 299. Here, Congress has exercised its Commerce Clause power to prohibit an interstate cannabis market. *See Gonzalez v. Raich*, 545 U.S. 1 (2005). The Court does not deny that an interstate cannabis market exists. And the Court recognizes that Washington's intrastate cannabis market affects this interstate cannabis market, which is not immune from economic protectionism. But it makes little sense why the dormant Commerce Clause would protect an interstate market that Congress affirmatively prohibited, given that protecting this market would facilitate illegal interstate activity. Peridot cannot use the dormant Commerce Clause to demand a constitutional right to participate in an illegal interstate market.

In addition to the First Circuit, Peridot points to several district courts that have concluded the dormant Commerce Clause proscribes or likely proscribes similar residency requirements. Dkt. 6 at 10, 15 (citing *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 990 (W.D. Mo. 2021); *Ne. Patients Grp. v. Me. Dep't of Admin. & Fin. Servs.*, 554 F. Supp. 3d 177 (D. Me. 2021) *aff'd sub nom. Ne. Patients Group*, 45 F.4th 542; *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 813 (E.D. Mich. 2021); *NPG*, 2020 WL 4741913, at *6; *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, (N.D.N.Y. 2022), *reconsideration denied*, No.

122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023)).[2] But none of these courts are within the Ninth Circuit, and others, including this district and the Eastern District of California, have reached different conclusions. *See, e.g.*, *Brinkmeyer*, 2023 WL 1798173, at *13 (upholding residency requirement because dormant Commerce Clause does not apply to illegal market); *Peridot Tree, Inc.*, 2022 WL 10629241, at *11 (declining to reach merits by invoking general abstention); *Original Invs., LLC v. State of Okla.*, 542 F. Supp. 3d 1230, 1235 (W.D. Okla. 2021) (dismissing case because to hold otherwise would facilitate plaintiff's participation in federally criminal activities). This Court is persuaded that *Brinkmeyer* is correct, and Peridot is therefore unlikely to succeed on the merits of its dormant Commerce Clause challenge. At most, these split decisions show "serious questions" under the post-*Winter* Ninth Circuit preliminary injunction standard. *See Roman*, 977 F.3d at 941 (quoting *All. for the Wild Rockies*, 632 F.3d at 1135) ("[W]here the 'balance of hardships . . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits."). But as discussed below, the balance of hardships also tips toward Defendants.

**D.   Peridot has not established a likelihood of irreparable harm.**

The Court next considers the possibility of irreparable harm should it deny preliminary injunctive relief. Peridot argues that a constitutional violation is an irreparable harm, even if damages are available. Dkt. 6 at 11 (citing *Am. Trucking Ass'ns*, 559 F.3d at 1058–59). It is true that when a plaintiff establishes a likelihood of success on the merits of a constitutional claim, "that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Baird*, 81 F.4th at 1040. But here Peridot is unlikely to prevail on the merits of its dormant Commerce Clause claim, or at best has raised serious questions based on conflicting

---

[2] *See Brinkmeyer*, 2023 WL 1798173, at *4, for an overview of cases addressing dormant Commerce Clause challenges to residency requirements for cannabis licenses.

decisions outside this circuit. Accordingly, there is a possibility, but not a likelihood, of irreparable harm from the alleged constitutional violation.

Peridot maintains that it would also suffer the irreparable harm of exclusion from Washington's cannabis market because to Peridot's knowledge, the LCB does not intend to issue additional licenses. Dkt. 6 at 11. But Defendants assert there will be future application rounds for cannabis retail licenses, noting that the Washington legislature authorized 52 additional Social Equity Program licenses and that the LCB has begun rulemaking for these licenses. Dkt. 15 at 22. Peridot contends that even if future licenses are available, the delay would deprive Peridot of the advantages of early entry into the market. Dkt. 6 at 11–12. But Peridot would not have received these advantages because a significant and established cannabis retail market existed in Washington before the Social Equity Program began. Moreover, Peridot has not shown that its application would have received a high enough score to win one of the eight King County licenses but for the challenged residency requirements and preferences.

Finally, Peridot's delay in bringing the action implies a lack of urgency, and thus, a lack of irreparable harm. *Oakland Trib., Inc. v. Chron. Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Peridot offered reasonable justifications for its delay in bringing the action after the LCB rejected its application in September 2023. *See* Dkt. 25 at 3–4. But a residency requirement has been in effect since 2012, the LCB created the Social Equity Program in 2020, the program's regulations became effective in November 2022, and the program accepted applications from March 1 to April 27, 2023. At oral argument, Peridot conceded that it knew when applying that it would not meet the minimum residency requirements. It did not need to wait for rejection to bring the action. *See Taniguchi*, 303 F.3d at 957 ("[S]tanding does not require exercises in futility."); *see, e.g., Brinkmeyer*, 2023 WL 1798173, at *7–8 (finding

standing for plaintiff that never applied for license because requiring application "would be futile—it is sufficiently clear that he does not qualify because he does not reside in Washington").

Peridot has not shown irreparable harm beyond the risk of a possible-but-unlikely constitutional violation. Thus, Peridot has established a possibility, but not a likelihood, of irreparable harm.

**E.    The balance of equities and public interest favor denying a preliminary injunction.**

The Court must weigh the possibility of irreparable harm to Peridot against hardship to the Defendants, others interested in the proceeding, and the public if the Court grants a preliminary injunction. *See Nken*, 556 U.S. at 434–35 (noting balance of equities and public interest *Winter* factors merge when government is a party). Peridot argues that an injunction is in the public interest because Washington's regulation is likely unconstitutional and "[t]he public interest is further served by protection of interstate participation in a cannabis market." *Id.* at 14. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). But again, Peridot has shown at most serious questions going to the merits of its constitutional claim.

Peridot also argues that an injunction would not harm Defendants because successful applicants have not yet completed the licensing process or opened their stores. Dkt. 6 at 13–14. The Court disagrees. Washington has designed a comprehensive regulatory system aimed at keeping the cannabis market intrastate and avoiding conflicts with the laws of other states that have not legalized cannabis, such as neighboring Idaho. *See* Dkt. 18 ¶ 11. For example, Washington forbids licensees from operating outside of the state, RCW § 69.50.325, or advertising cannabis across state lines, RCW § 69.50.369(4) ("A cannabis licensee may not engage in advertising or other marketing practice that specifically targets persons residing

outside of the state of Washington."). Washington also forbids cannabis sales to tribal entities unless the State and the tribe have entered an agreement. RCW § 69.50.3251. This regulatory system helps Washington adhere to the enforcement priorities outlined in the Cole Memo, which the State describes as continuing to be "the hallmark guidance that states follow" to "prevent federal interference" in the state-level legalization of cannabis. Dkt. 18 ¶ 11; *see* Dkt. 18-1 at 2 (prioritizing preventing "the diversion of marijuana from states where it is legal under state law in some form to other states").

It bears noting that this system is consistent with another continuous thread of the Supreme Court's dormant Commerce Clause jurisprudence: "the common sense of our traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles." *Tracy*, 519 U.S. at 306. The Court has "consistently recognized" the "legitimate state pursuit of such interests as compatible with the Commerce Clause," which was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Id.* at 306–07 (internal quotation marks and citation omitted). "[T]he Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy," and the application of the dormant Commerce Clause by the courts must "respect [this] cross-purpose as well." *Dep't of Revenue of Ky.*, 553 U.S. at 338.

The tension created by Congress's action (or inaction) in continuing to criminalize cannabis through the CSA even as an increasing number of states move toward legalization— and the federal executive branch looks the other way—is in many ways an example of federalism playing out. Although there might be public policy arguments for why this situation is undesirable, it is not this Court's role to use the dormant Commerce Clause to shortcut that process and effectively legalize interstate participation in the cannabis market while Congress's

exercise of its affirmative Commerce Clause power continues to declare that market illegal. Washington's comprehensive regulatory system serves its citizens' interests in maintaining their local autonomy to experiment with cannabis legalization while minimizing their risk of federal prosecution.

Finally, Peridot's requested injunction would harm successful Social Equity Program applicants who have secured storefronts, purchased equipment, or incurred other costs in reliance on the LCB's communications allowing them to begin the licensing process. *See* Dkt. 16 ¶ 15; *see, e.g.*, *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (noting that likelihood of irreparable harm must be "balanced against any harm . . . to the interests of people and institutions that are not parties to the case"). Enjoining Washington's residency requirements would thus cause significant hardship to Defendants and successful Social Equity Program applicants, and there is a strong public interest in not disrupting the State's efforts to keep the cannabis market intrastate. Although there is a possibility of irreparable harm from a constitutional violation and public interest in preventing the possibility of such a violation, these factors do not tip the balance of equities "sharply towards the plaintiff" such that Peridot's showing of serious questions would "warrant preliminary injunctive relief." *See Roman*, 977 F.3d at 941.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for preliminary injunction (Dkt. 6).

Dated this 5th day of January, 2024.

Tiffany M. Cartwright
United States District Court Judge